## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**ROSE GILLARD, LAURA CROSKEY, MICHELLE DECORTE, BESSY GUADALUPE, JULIO PACHECO, PAULA J. RIVERA, KENNETH F. RUBI, DONNA SWIFT, and ANGELA VARGAS,**

**Plaintiffs,**

v.

**TONI ZICCARDI, individually, DAVID GAW, individually, and THE HERTZ CORPORATION, a Delaware Corporation,**

**Defendants.**

**Civil Case No. 04-CV-20491-KING**
**MAGISTRATE JUDGE O'SULLIVAN**

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

On February 12, 2004, Plaintiffs filed a Complaint in state court against Defendants Toni Ziccardi, David Gaw (herein the "Individual Defendants"), and The Hertz Corporation ("Hertz") alleging that: (1) Hertz terminated their employment on or about February 28, 2002, in violation of Florida's Whistleblower Protection Act ("WPA"), F.S. §§ 448.101, *et seq.* (Plaintiffs' Complaint ¶¶ 12, 15); and, (2) that Hertz's termination of Plaintiff Swift also violated the Family and Medical Leave Act (herein the "FMLA"), 29 U.S.C. § 825. (Plaintiffs' Complaint at ¶¶ 19-22). Defendants removed the action to this Court on March 2, 2004, on the basis of both federal

question and diversity jurisdiction.[1]

Defendants now seek dismissal of Plaintiffs' claims under the WPA because they are preempted to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 ("Section 301"), and Plaintiffs have failed to state a claim for relief under Section 301. The Individual Defendants also seek dismissal with respect to themselves inasmuch as the WPA does not create a cause of action against supervisors. The only claim not subject to dismissal on these grounds is Plaintiff Swift's FMLA claim against Hertz.

## I.    STATEMENT OF FACTS

Plaintiffs were employed by Hertz as Customer Service Representatives at Hertz's Miami Airport car rental operation. (Ziccardi Affidavit, ¶ 5, attached hereto as Exhibit 1).[2] The terms and conditions of Plaintiffs' employment at Hertz were governed by a collective bargaining agreement ("CBA") between Hertz and the International Brotherhood of Teamsters Local Union No. 390 (hereinafter "the Union")(Ziccardi Aff., ¶ 6, and Exhibit A thereto).

---

[1] With respect to diversity jurisdiction, and as stated in Defendants' Notice of Removal, the only claim plead against the Individual Defendants arises under the WPA, which provides no cause of action against individuals and said Individual Defendants were, therefore, fraudulently joined for the purpose of defeating diversity jurisdiction. As argued herein, the Individual Defendants are entitled to be dismissed from this action, thereby leaving Hertz, a Delaware corporation with its principal place of business in New Jersey, and Plaintiffs, residents of Florida, as the only parties to this proceeding.

[2] Submission of these materials, which are outside the pleadings, does not convert this Motion to one for summary judgment pursuant to Rule 56, Fed. R. Civ. P., because they are submitted solely for the purpose of determining the Court's jurisdiction under Section 301. *McMaster v. U.S.*, 177 F.3d 936 (11th Cir. 1999), *cert. denied* 528 U.S. 1118 (2000); *Green v. Forney Engineering Co.*, 589 F.2d 243 (5th Cir. 1979)(court may consider material outside the Complaint that is pertinent to the question of the court's jurisdiction); *LaBuhn v. Bulkmatic Transport Co.*, 644 F.Supp. 942, 943 at n.2 (N.D. Ill., 1986), citing *Crawford v. United States*, 796 F.2d 924, 927 (7th Cir. 1986).

During the period between late February and May 2002, Plaintiffs were terminated from Hertz. (*Id.* at ¶ 7).[3] Subsequent to their terminations, each Plaintiff filed grievances pursuant to the grievance/arbitration provisions of the CBA. (*Id.* at ¶ 8, and Exhibits A and B thereto). On September 25, 2002, Hertz and the Union entered into a Settlement Agreement resolving Plaintiffs' grievances, as well grievances filed by other employees terminated at or about the same time and for the same reasons as Plaintiffs. (*Id.* at ¶ 9, and Exhibit B thereto).

Pursuant to the September 25, 2002 Settlement Agreement, Hertz and the Union agreed, in pertinent part, that (1) all arbitration proceedings from the above-described grievances were withdraw and dismissed by the Union; (2) certain of the terminated employees, including specifically Plaintiff Angela Vargas, were reinstated to employment with Hertz, subject to meeting certain specified terms and conditions, including execution of a General Release of All Claims, and a Last Chance Agreement; (3) certain of the terminated employees would not be reinstated, including the other Plaintiffs herein, although pursuant to a timely request from the employee, those Plaintiffs' personnel records were subject to modification, so that instead of discharge, their record would reflect a resignation; and, (4) the Reinstated Employees, including Plaintiff Angela Vargas, would cooperate with Hertz in defending any remaining arbitrations or the prosecution of any civil suits arising out the conduct underlying the above-described terminations. (*Id.* at ¶ 10, and Exhibit B thereto).

Nearly two years later, Plaintiffs brought the instant action containing vague allegations

---

[1] Hertz has not recited the reasons for or evidence supporting the discharges, because they are not germane to the jurisdictional issues raised herein, and Hertz does not at this time seek summary disposition with respect to the merits of these terminations.

that their terminations violated the WPA.  As argued hereafter, Plaintiffs' claims are preempted

to Section 301, and Plaintiffs have failed to state a claim under the LMRA.  As also argued

hereafter, the Individual Defendants are entitled to dismissal because there is no individual

liability under the WPA.

## II.    ARGUMENT AND CITATION OF AUTHORITIES

### A.  Plaintiffs' Claims Under The WPA Are Preempted To § 301

The express language of the WPA will require that the Court interpret the terms of the

CBA, as well as the September 25, 2002 Settlement Agreement entered into by Hertz and

Plaintiffs' Union representative pursuant to the CBA.  As a result, Plaintiffs' claims under the

WPA are preempted to § 301.

#### a.  Section 301 Preempts All State Law Claims That Require Interpretation Of the CBA

It is well-established that § 301 of the Management Labor Relations Act, 29 U.S.C. §

185, preempts any state law claim which requires analysis of a collective bargaining agreement:

> [I]f the resolution of a state-law claim *depends upon the meaning of a collective-bargaining agreement*, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles  necessarily uniform throughout the Nation—must be employed to resolve the dispute.

*Lingle v. Norge Div. Of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1988)(emphasis added).

Although not every state-law claim is preempted, to the extent that a state claim cannot be

resolved without construing the terms of the collective bargaining agreement, § 301 preemption

applies.  *Id.* at 409-410.

> Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S.Ct. 1904 (1985).

The challenge for the court, then, is to "locate the line between the need for mere consultation of a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims." *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 10 (1st Cir. 1999). "This line is easy to locate where the state's employment statute at issue *requires* courts to interpret collective bargaining agreements." *Bishop v. Bell Atlantic*, 81 F.Supp.2d 84, 88 (D. Maine, 1999)(emphasis added).

## B. Florida's WPA Is Preempted By Section 301 Because It *Requires* Impermissible Interpretation Of The CBA

The state law at issue here, Florida's WPA, *requires* interpretation of a collective bargaining agreement and, by its terms, is inextricably intertwined with the terms of the labor contract. The WPA provides, in pertinent part:

> *This act does not diminish the rights, privileges, or remedies of an employee or employer* under any other law or rule or *under any collective bargaining agreement* or employment contract.

F.S. § 448.105 (emphasis added).

By its express language, therefore, the WPA *requires* this Court to ascertain both the employer's and the employees' "rights, privileges and remedies" under the CBA, including the

Settlement Agreement entered into between Hertz and the Union pursuant to that CBA.   The
Court then must determine whether those "rights, privileges and remedies" are or will be
diminished by Plaintiffs' pursuit of their claims under the WPA. As a result, the statute requires
the Court to interpret the CBA and Settlement Agreement between the parties and Plaintiffs'
claims under the WPA are preempted by § 301.

Although no decision of the U. S. Court of Appeals for the Eleventh Circuit has been
identified that considers the effect of such statutory language in the context of § 301 preemption,
the U.S. Court of Appeals for the First Circuit has considered the impact of similar statutory
provisions and concluded that it requires preemption under § 301.   In *Lydon v. Boston Sand &
Gravel*, 175 F.3d 6 (1st Cir. 1999), the court considered the preemptive effect of a provision in
the Massachusett's state workers compensation law, which states that: "In the event that any
right set forth in this section is inconsistent with an applicable collective bargaining agreement,
such agreement will prevail." Mass. Gen. L. ch. 152, § 75B(3).  In finding, as a matter of law,
that this provision would require a court to first interpret the provisions of the applicable CBA,
the court stated:

> [T]he quoted provision required courts to interpret the relevant
> CBA to determine whether it was inconsistent with the state
> statute. *So even if the state cause of action did not itself require
> the court to construe the CBA, the inconsistency clauses of the
> state statutes would require such interpretation.*   Thus, for
> example, [plaintiff's] state claims were held preempted "not
> because the collective bargaining agreement *is* inconsistent with
> the state claims asserted, but because it *may* be so and requires
> interpretation." (*Martin* 105 F.3d at 44 (emphasis in original)).

*Lydon*, 175 F.3d at 11, quoting *Martin v. Shaws Supermarkets, Inc.*, 105 F.3d 40, 44 (1st Cir.

-6-

1997)(emphasis added).

The *Lydon* Court's finding of preemption was consistent with the First Circuit's prior decision in *Magerer v. John Sexton Co.*, 962 F.2d 525 (1ˢᵗ Cir. 1990). In holding that the above-quoted provision from the Massachusetts workers compensation act required a finding of preemption, the *Magerer* Court reasoned that:

> This provision makes clear that to the extent that the collective bargaining agreement provides standards to govern the conduct underlying plaintiff's retaliatory discharge claim, the claim will be governed by the standards of the agreement, rather than by the standards of ch. 152, § 75B. And to that extent, claims under section 75B will require interpretation of the agreement and, therefore, will be preempted by Section 301. . . .
>
> The collective bargaining agreement at issue here contains several provisions that could be construed to govern the conduct underlying plaintiff's retaliatory discharge claim. Most significantly, the agreement's "management rights" clause vests in the employer, among other rights, the right to determine "the direction of the work forces, including the disciplining, suspension or *discharge of employees for proper cause.*" (emphasis added).
>
> *     *     *
>
> Thus, under Mass.Gen.Laws ch. 152 § 75B(3), the rights and obligations of [employer] and plaintiff regarding plaintiff's discharge are controlled by the contractual provisions governing discharge and not by an independent state standard. It follows that the resolution of plaintiff's statutory retaliatory discharge clam depends on an interpretation of the collective bargaining agreement, so that the claim is completely preempted by Section 301.

*Id.* at 529 (internal citations omitted).

While the statutory language in *Lydon* and *Magerer* was substantially similar to that of the WPA, in *Bishop v. Bell Atlantic Corp.*, 81 F.Supp.2d 84 (D. Maine, 1999), the court dealt

-7-

with language contained in the Maine Whistleblowers' Act that is virtually identical to that of the

Florida WPA. The Maine law, like the WPA, expressly provides that it "shall not be construed

to diminish or impair the rights of a person under any collective bargaining agreement." 26

M.R.S.A. § 837. In finding that this language required preemption of plaintiff's claim pursuant

to § 301, the *Bishop* court held:

> This provision would require the Court to interpret the CBA
> between [employer] and [plaintiff's] Union in order to ensure that
> the Whistleblowers' Act does not "diminish or impair the rights"
> of those operating under the CBA. . . . Since the Court is not
> permitted to engage in such interpretation, Plaintiff's claim under
> the Whistleblowers' Protection Act is preempted.
>
> \*      \*      \*
>
> Even if [plaintiff's] claim under the Whistleblowers' Act could
> ultimately be stated and proven without reference to the CBA, *the*
> *Court would first have to interpret the CBA to determine whether*
> *or not the Act would diminish or impair the rights of employees or*
> *management under the CBA.*

81 F.Supp.2d at 89 (footnote omitted).

Because the Florida WPA, like the Massachusetts workers compensation statute and the

Maine Whistleblowers' Act, contains language requiring the Court to interpret the CBA to

determine whether or not it would "*diminish the rights, privileges, or remedies of an employee*

*or employer . . . under any collective bargaining agreement*" Count I of Plaintiffs' Complaint

must be deemed completely preempted by § 301 of the Labor Management Relations Act, 29

U.S.C. § 185. F.S. 448.105.[4] Simply put, the Florida law, by its express language, requires the

---

[4] In *Schroeder v. Crowley Maritime Corp.*, 825 F.Supp 1007 (S.D. Fla. 1993), which pre-dates
the decisions in *Lydon* and *Bishop*, Judge Gonzalez concluded that the WPA is not preempted by
§ 301. In doing so, however, it appears that the court relied upon an incorrect legal standard.

Court to engage in a close review and construction of the "rights, privileges or remedies" of the employer and the employees under the collective bargaining agreement and to determine the impact that application of the statute would have upon them.    Such interpretation of the collective bargaining agreement is precisely what § 301 prohibits and Hertz respectfully submits that Plaintiffs' claims under the WPA are preempted by § 301.

**C.    Plaintiffs Have Failed To State A Cause Of Action Under the LMRA.**

**a.    § 301 Requires Dismissal Of Plaintiffs' Claims For Failure To Exhaust The Grievance/Arbitration Procedure Or Allege A Breach Of The Duty Of Fair Representations By The Union**

Assuming Plaintiffs' claims under the WPA are preempted to federal law, the Court must then evaluate these claims pursuant to the uniform federal common law of labor developed under

---

Thus the *Schroeder* court incorrectly held that "a state law claim is pre-empted by § 301 when it is *impossible to determine* whether the plaintiff is entitled to relief without interpreting the collective bargaining agreement itself," 825 F.Supp. at 1009 (emphasis added). This standard is *inconsistent* with both the test developed by the Supreme Court for determining whether a state law is preempted by § 301 and with the Supreme Court's reasoning in *Lingle* itself. In *Lingle*, the Court considered the elements of proof necessary to make out a claim of retaliatory discharge under the Illinois workers compensation statute, and concluded that the Illinois law presented "purely factual questions pertain[ing] to the conduct of the employee and motivation of the employer" and, on that basis, held "[n]either of the elements *requires a court to interpret any term of a collective bargaining agreement.*" 486 U.S. at 407. The key distinguishing factor is that the Illinois statute considered in *Lingle* contains no language *requiring* interpretation of the CBA. The Florida law, by contrast, *expressly restricts enforcement of the statute to prevent diminishing the employer's and employee's rights under "any collective bargaining agreement."* F.S. § 448.105. The Florida's legislature's inclusion of this limitation indisputably differentiates the Florida statute from the law under review in *Lingle*, and moves it into the realm of cases in which "pertinent principles of state law *require* construing the relevant collective-bargaining language." 486 U.S. at 407, n.7; *Lueck*, 471 U.S. 202, and *Electrical Workers v. Hechler*, 481 U.S. 851 (1987). Hertz respectfully submits that the rationale stated in *Magerer, Lydon*, and *Bishop*, much of which Judge Gonzalez did not have the benefit of when he decided *Schroeder*, reflects that the correct rationale on this issue and that the language of the WPA will require the Court to interpret the provisions of the CBA.

Section 301 of the LMRA.  Section 301 provides in pertinent part that "suits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court having jurisdiction over the parties." 29 U.S.C. § 185.  Before such a breach of contract lawsuit is cognizable, however, federal labor policy requires exhaustion of the grievance arbitration procedures contained in a collective-bargaining agreement. *DelCostello v. Teamsters*, 462 U.S. 151, 163 (1983).  Moreover, and absent very limited exceptions, failure to exhaust such available procedures warrants dismissal of the action.  *Id.* at 164.

In this case, the CBA provides a grievance arbitration procedure which Plaintiffs utilized. Moreover, Hertz and the Union resolved Plaintiffs' grievances prior to entry of a decision by an arbitrator, by entering into a mutually binding Settlement Agreement.  By entering into this Agreement, the Union exercised its discretion to resolve the dispute prior to exhaustion of the grievance arbitration procedure, and in the absence of any claim that the Union breached its duty of fair representation, Plaintiffs' cause of action under § 301 must be dismissed.  *Escamilla v. United Food & Commercial Workers Int'l. Union*, 209 F.Supp.2d 653, 658 (M.D. Tex., 2002); *Turner v. Air Transport Dispatchers' Ass'n.*, 468 F.2d 297, 299-300 (5th Cir., 1972).

### b. § 301 Requires Dismissal Of Plaintiffs Claims Because No Breach Of The Union's Duty Of Fair Representation Has Been Plead

An exception to the requirement that grievance arbitration procedures be exhausted exists where a union breaches the duty of fair representation by improperly handling of an employee's grievance. *DelCostello*, 462 U.S. at 164; *Vaca v. Sipes*, 386 U.S. 171, 184, (1967).  When such a breach occurs, it eliminates the employee's ability to exhaust the grievance arbitration remedies

-10-

available under the CBA.  In such a circumstance, the employee is free to sue both his union and

his employer, in a so-called "hybrid Section 301" lawsuit.  *DelCostello*, 462 U.S. at 165.  To

make out a hybrid Section 301 claim, the employee must plead and prove <u>both</u> a breach of the

duty of fair representation <u>and</u> a breach of the collective bargaining agreement.  As such claims

are "inextricably interdependent," failure to prove either leg of the hybrid § 301 claim defeats the

cause of action.  *DelCostello*, 462 U.S. at 165; *Parker v. Connors Steel Co.*, 855 F.2d 1510,

1521-22 (11th Cir., 1988), *cert. denied*, 490 U.S. 1066 (1989).  This standard applies even when,

as here, the employee has chosen to sue either, but not both, the union or the employer.

*DelCostello*, 462 U.S. at 165.

The duty of fair representation arises as a consequence of the union's position as the

exclusive representative of the bargaining unit members.  Because the union is the exclusive

representative for these individuals, and wields exclusive authority to negotiate for and represent

them, it has a duty to fairly represent all employees in the bargaining unit.  *Vaca*, 386 U.S. at

177.  This duty requires the union to exercise honesty and prudence, and to avoid discrimination

and arbitrariness in dealing with the bargaining unit members.  *Id.*  Consequently, a Union

violates its duty of fair representation only where it can be shown to have acted (1) arbitrarily,

(2) discriminatorily or (3) in bad faith.  *Vaca*, 386 U.S. at 190; *Parker*, 855 F.2d at 1520; *Harris

v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982).  In evaluating whether a

union's exercise of its discretion in representing bargaining unit members constituted a breach of

its duty of fair representation, the court must apply a "highly deferential" standard of review.

*Airlines Pilot Assoc. v. O'Neil*, 499 U.S. 65, 67 (1991) (the standard of review applicable to

-11-

union representation actions is equivalent to judicial review of legislative decisions).

In this case, Plaintiffs do not allege any breach of the duty of fair representation by the Union. Plaintiffs, therefore, have failed to plead any viable cause of action under Section 301, and their Complaint must be dismissed.

> **c.     Amendment To Add A Fair Representation Claim In This Case Is Futile As Barred By The Applicable Statute Of Limitations**

The statute of limitations applicable to hybrid Section 301 claims is borrowed from Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), which limits the time period for challenging an unfair labor practice to six (6) months. *DelCostello,* 462 U.S. at 164; *Davis v. United Auto, Aerospace & Agricultural Implement Workers of America,* 765 F.2d 1510, 1512-13 (11th Cir. 1985). Any hybrid § 301 claim Plaintiffs could have alleged in this case arose on September 25, 2002, the date on which the Union entered into the Settlement Agreement with Hertz, finally resolving the grievances challenging Plaintiffs' terminations. The six (6) month statutory limitation period expired on or about March 25, 2003, nearly one year ago.

Any effort by Plaintiffs in this case, therefore, to amend their Complaint to add a claim that the Union breached its duty of fair representation with regard to its resolution of the Plaintiffs' termination grievances is futile as barred by the six (6) month statute of limitations, and Plaintiffs' claims are subject to dismissal under § 301.

> **D.     Plaintiffs' Claims Against The Individual Defendants Must Be Dismissed Because The WPA Imposes Liability On Employers, Not Supervisors**

Plaintiffs' only claim against the Individual Defendants is an alleged violation of the WPA (Count I). The Act, however, provides no cause of action against individuals, and indeed,

establishes a specific threshold for employers, limiting its applicability to only those entities employing ten or more persons. F.S. § 448.101(3).

In construing the meaning of a statute, Florida law requires that the entire statute be considered and given meaning:

> [I]t is a cardinal rule of statutory construction that the entire statute under consideration must be considered in determining legislative intent, and effect must be given to every part of the section and every part of the statute as a whole. From a view of the whole law in pari materia, the Court will determine the legislative intent.

*DeArmas v. Ross*, 680 So.2d 1130, 1131 (Fl. Ct. App., 1996), *quoting State v. Gale Distribs., Inc.*, 349 So.2d 150, 153 (Fl. 1977).

When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." *Holly v. Auld*, 450 So.2d 217, 219 (Fla. 1984), *quoting A.R. Douglass, Inc. v. McRainey*, 102 Fla. 1141, 137 So. 157 (1931).

In two recent cases, Florida appellate courts have held that the corollary public sector Whistleblowers Act, F.S. § 112.3187, does not provide a cause of action against an individual, including the head of an agency. *DeArmas*, 680 So.2d 1130, 1131 (Fla. 3d DCA 1996); *Costa v. School Bd. Of Broward Cty.*, 701 So.2d 414, 416 (Fla. 4th DCA 1997). In *DeArmas*, in light of the requirement that it give meaning to the entire statute, the court reviewed the public sector WPA and, focusing on the nature of the relief provided under the statute, concluded that "the Legislature did not intend to subject officials or officers of an agency to suit in their individual

-13-

capacities.  Specifically, subsection (9) makes it clear that the *relief afforded under the Act is against the entity.*"  680 So.2d at 1131 (emphasis added).

This Court, in reviewing the provisions of the private sector WPA at issue here, should apply the same standards, and reach the same outcome.  Florida's WPA specifically defines ***"employer"*** as "any private individual, firm, partnership, institution, corporation, or association *that employs ten or more persons*."  F.S. § 448.101(3).  The WPA also includes a specific definition for the term "supervisor."  A "supervisor" is defined to be "an individual within an employer's organization who has the authority to direct and control the work performance of the affected employee or who has managerial authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains."  F.S. 448.101(6).  The conduct prohibited by the WPA does not include actions by a supervisor, rather it is expressly directed to prohibiting conduct by an ***employer:*** "[a]n ***employer may not take any retaliatory personnel action against an employee*** because the employee has [engaged in protected activity, or opposed prohibited activity, as specified in the Act]."  F.S. § 448.102.  Similarly, the term "retaliatory personnel action" is defined only in terms of the ***employer's*** adverse employment action against an employee; no reference to actions by a supervisor is included.  F.S. § 448.101(5).  Finally, as is the case with the public sector WPA construed in *DeArmas*, the remedies provided by the statute are directed exclusively at the ***employer***.  The statute provides for injunctive relief, the employees' reinstatement to employment with the employer, reinstatement of fringe benefits and seniority, compensation for lost wages, benefits and other remuneration and such other compensatory damages as are allowable.  F.S. 448.103(2)(a)-(e).

-14-

No remedy is provided for against supervisors.

The specific inclusion in the WPA of definitions for the terms "supervisor" and "employer" evidences the Legislature's intent to draw a distinction between an employer and a supervisor.  The Legislature's exclusion of the term "supervisor" from the sections of the statute identifying prohibited conduct, F.S.§ 448.102, and the failure of the Legislature to provide any remedy against a "supervisor," F.S. § 448.103(2), likewise establishes that the Legislature *did not intend* the prohibitions or remedies of the WPA to be directed at an individual supervisor.  Indeed, had the Florida Legislature intended to impose liability on individual supervisors, it could easily have added the term "supervisor" to the Act's provisions setting out prohibited conduct and to its remedies provisions.

A conclusion that the Legislature did not intend to allow for individual liability under the WPA is also consistent with decisions holding that the Florida Civil Rights Act ("FCRA"), F. S. § 760.01, *et seq.*, does not permit individual liability in employment discrimination suits. *See, e.g., Sanders v. Mayor's Jewelers, Inc.*, 942 F.Supp. 571, 573-574 (S.D.Fla. 1996).  Like the WPA, the FCRA prohibits conduct by an "employer," F.S. § 760.10(1)(a).  "Employer" is defined in the FCRA as "any person employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person."  F.S. § 760.02(7).  The FCRA's definition of employer is identical to that of Title VII, 42 U.S.C. § 2000e(b), which likewise provides no individual liability in employment discrimination suits brought under federal law. *See, e.g., Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991).

-15-

The plain language of the WPA leaves no room for a finding that the Legislature intended to impose liability on individual supervisors or managers. Consistent with other remedial statutes governing employment, the Legislature elected not to impose liability on individual supervisors. This Court should give effect to the plain language of the statute and, consistent with the cases construing the public sector Whistleblowers Act, and the FCRA, dismiss Plaintiffs' claims against the Individual Defendants.

## CONCLUSION

For the foregoing reasons, Count I of Plaintiffs' Complaint should be dismissed in its entirety and with respect to all Defendants. In addition, the Individual Defendants are entitled to dismissal of Plaintiffs' Complaint against them in its entirety, because Plaintiff Donna Swift has not directed her claims under the FMLA, set out in Count II of the Complaint, against the Individual Defendants.

Respectfully submitted this 5 day of March, 2004.

John W. Campbell
Florida Bar No. 998021

Frank B. Shuster                                    For
Georgia Bar No. 644722
*Admission pro hac vice pending*

CONSTANGY, BROOKS & SMITH, LLC
100 West Kennedy Boulevard
Suite 500
Tampa, Florida 33602

Telephone:  (813) 223-7166
Facsimile:  (813) 223-2515
**Attorneys for Defendants**

-17-

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ROSE GILLARD, LAURA CROSKEY,
MICHELLE DECORTE, BESSY
GUADALUPE, JULIO PACHECO,
PAULA J. RIVERA, KENNETH F.
RUBI, DONNA SWIFT, and ANGELA
VARGAS,

                  **Plaintiffs,**

v.

TONI ZICCARDI, individually, DAVID
GAW, individually, and THE HERTZ
CORPORATION, a Delaware
Corporation,

                  **Defendants.**

Civil Case No. 04-CV-20491-KING
MAGISTRATE JUDGE O'SULLIVAN

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date a copy of *Defendants' Motion to Dismiss and Defendants' Memorandum in Support of Motion to Dismiss* was served on Plaintiffs by depositing a copy of same in the United States Mail, postage prepaid, and addressed as follows:

William O. Solms, Jr.
SOLMS & PRICE, P.A.
6701 Sunset Drive, Suite 104
Miami, Florida 33143

This _5_ day of March, 2004.

JOHN W. CAMPBELL, ESQ.

CONSTANGY, BROOKS & SMITH, LLC
100 West Kennedy Boulevard
Suite 500
Tampa, Florida 33602
Telephone: (813) 223-7166
Facsimile: (813) 223-2515

# EXHIBIT 1

*Rose Gillard, et al. v. Toni Ziccardi, et al.*
**Defendants' Memorandum In Support Of Motion To Dismiss**

CONSTANGY, BROOKS & SMITH, LLC
(813) 223-7166

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ROSE GILLARD, LAURA CROSKEY,
MICHELLE DECORTE, BESSY
GUADALUPE, JULIO PACHECO,
PAULA J. RIVERA, KENNETH F. RUBI,
DONNA SWIFT, and ANGELA VARGAS,

Plaintiffs,

v.

TONI ZICCARDI, individually, DAVID
GAW, individually, and THE HERTZ
CORPORATION, a Delaware Corporation,

Defendants.

Civil Case No. _____-CIV
USDJ _____/USMJ_____  _____

## AFFIDAVIT OF TONI ZICCARDI

I, Toni Ziccardi, under oath, depose and state as follows:

1.      I am a named Defendant in the above-entitled matter.

2.      I am over 18 years of age and have personal knowledge of the information contained herein.

3.      I am employed by Defendant The Hertz Corporation ("Hertz") in the position of City Manager of Hertz's car rental operation in Miami, Florida.   I have supervisory and managerial authority to direct and control the work performance of Hertz employees in Miami, Florida, and to take corrective action regarding employee complaints.

- 1 -

4.     I am personally familiar with the employment relationship between Hertz and each of the Plaintiffs named in this lawsuit.

5.     Each of the Plaintiffs named in this lawsuit was employed by Hertz as a Customer Service Representative at Hertz's airport car rental operation in Miami, Florida.

6.     The employment relationship between Hertz and each of the named Plaintiffs is, and has at all times been governed by a collective bargaining agreement between The Hertz Corporation and the International Brotherhood of Teamsters, Local Union No. 390 (the "Union")(Exhibit A).

7.     The employment of each of the named Plaintiffs was terminated by Hertz between late February and May 2002.

8.     Each of the named Plaintiffs, through their bargaining representative, challenged their termination by filing a grievance pursuant to the grievance/arbitration provisions of the collective bargaining agreement between Hertz and the Union.

9.     On September 25, 2002, Hertz and the Union entered into a Settlement Agreement resolving the Plaintiffs' grievances, as well as those filed by other employees terminated at or about the same time and for the same reasons as Plaintiffs. (Exhibit B).

10.     Pursuant to the September 25, 2002 Settlement Agreement, Hertz and the Union agreed, in pertinent part, that (1) all arbitrations proceeding from the grievances filed by the Plaintiffs and other employees challenging their terminations were withdrawn and dismissed by the Union; (2) certain of the terminated employees, including specifically Plaintiff Angela Vargas, were reinstated to employment with Hertz, subject to meeting certain specified terms and conditions, including execution of a General Release of All Claims, and a Last Chance

- 2 -

Agreement; (3) certain of the terminated employees would not be reinstated, including the other Plaintiffs herein, although pursuant to a timely request from the employee, those Plaintiffs' personnel records were subject to modification, so that instead of a discharge, their record would reflect a resignation; and, (4) the reinstated employees, including Plaintiff Angela Vargas, would cooperate with Hertz in defending any remaining arbitrations or the prosecution of any civil suits arising out of the conduct underlying the terminations. (Exhibit B).

11.    At all times relevant to this matter, David Gaw, a named Defendant, has been employed by Hertz in the position of Employee Relations Manager for the Florida Region, and he had supervisory responsibility over human resource matters, including union matters, Hertz's airport car rental operation in Miami, Florida.

12.    I have read the above affidavit, and declare under penalty of perjury pursuant to the laws of the State of Florida and of the United States that the foregoing is true and correct to the best of my personal knowledge as of the date set forth below.

Dated this 4 day of March, 2004.

Toni Ziccardi

Subscribed and sworn to before me this on this 4 day of March, 2004.

Notary Public, Miami-Dade County, Florida
My commission expires:



MERCEDES VALDES
MY COMMISSION # DD 092320
EXPIRES March 5, 2006
Bonded Thru Notary Public Underwriters

# EXHIBIT A

*Rose Gillard, et al. v. Toni Ziccardi, et al.*
**Affidavit Of Toni Ziccardi**

**CONSTANGY, BROOKS & SMITH, LLC**
**(813) 223-7166**

OCT 18

# THE HERTZ CORPORATION

and

# TEAMSTERS LOCAL UNION NO. 390

### COUNTER SALES REPRESENTATIVES

### MIAMI, FLORIDA

### AUGUST 7, 2000 - AUGUST 6, 2003

| SECTION | | PAGE |
|---|---|---|

| | | |
|---|---|---|
| ARTICLE 1 | UNION RECOGNITION | 1 |
| ARTICLE 2 | SENIORITY | 3 |
| ARTICLE 3 | LEAVE OF ABSENCE | 4 |
| ARTICLE 4 | RIGHTS | 6 |
| ARTICLE 5 | JOB STEWARDS | 6 |
| ARTICLE 6 | BONDS | 7 |
| ARTICLE 7 | DISCHARGE AND SUSPENSION | 8 |
| ARTICLE 8 | ADJUSTMENT OF DISPUTES | 8 |
| ARTICLE 9 | PROTECTION OF RIGHTS | 9 |
| ARTICLE 10 | COMPENSATION CLAIMS | 10 |
| ARTICLE 11 | MILITARY LEAVE OF ABSENCE | 10 |
| ARTICLE 12 | PAY PERIODS | 10 |
| ARTICLE 13 | UNIFORMS | 10 |
| ARTICLE 14 | EXAMINATIONS | 11 |
| ARTICLE 15 | JOB CLASSIFICATIONS | 11 |
| ARTICLE 16 | HOURS AND WAGES | 11 |
| ARTICLE 17 | HOLIDAYS | 13 |
| ARTICLE 18 | VACATIONS | 14 |
| ARTICLE 19 | SICK LEAVE, JURY DUTY AND FUNERAL LEAVE | 15 |
| ARTICLE 20 | HEALTH AND WELFARE | 15 |
| ARTICLE 21 | PENSION PLAN | 16 |
| ARTICLE 22 | PART-TIME EMPLOYEES | 16 |
| ARTICLE 23 | TEAMSTERS NATIONAL 401(K) | 17 |
| ARTICLE 24 | TERMINATION | 18 |
| | APPENDIX A | A-1 |

# LABOR AGREEMENT

By and between THE HERTZ CORPORATION, a Delaware Corporation, as specifically applying to its Rent-A-Car Stations located in Miami, Miami Airport and Miami Beach, Dade County, Florida, party of the first part, hereinafter referred to as the "Employer" and FREIGHT DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL UNION 390, an affiliate of the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, as certified under National Labor Relations Board Case No. 12 RC 591, hereinafter referred to as the "Union."

## ARTICLE 1:
## UNION RECOGNITION, HIRING, CHECK-OFF AND UNION VISITATIONS

SECTION 1.  The Employer recognizes the Union as the exclusive bargaining agency for all Counter Sales Representatives and Counter Sales Representative Lead Persons, of the Employer's Rent-A-Car Division in Miami, Miami Airport and Miami Beach, Dade County, but excluding all other employees, such as Sales Persons, Office, Secretarial, Guard, Vehicle Service Attendants, Mechanics, Confidential Employees, Supervisory Employees and all employees of the Truck Lease Division.

SECTION 2.  HIRING NEW EMPLOYEES  The Employer shall give the Union first opportunity with all other sources to refer suitable applicants for employment, but the Employer shall not be required to hire those referred by the Union.

SECTION 3.  NOTIFICATION TO THE UNION  The following information will be given in writing by the Employer to the Union within seven (7) days from the date of hiring new employees:  (1) Name, Home Address and Social Security Number of employee; (2) Date employed.

SECTION 4.  PROBATIONARY PERIOD  Any person newly employed shall be so employed for sixty (60) days worked on a trial basis, during which time they may be discharged for cause or released without prejudice.  After sixty (60) days worked, they shall be considered regular employees and placed on the seniority list.  Their seniority date shall revert back to the first day of employment.  Probationary employees shall have the benefits under the Grievance Procedure.

SECTION 5(a).  CHECK-OFF  The Employer agrees to deduct initiation fee and monthly dues from the wages of those employees who shall individually and voluntarily authorize the Employer, in writing, on forms issued by the Union to make such deductions, which shall be forwarded to the Union before the last day of each month for which the deduction is made.

- 1 -

SECTION 5(b). AGENCY SHOP  No provisions of this Article shall apply in Florida to the extent that it may be prohibited by State law.  If under applicable State law additional requirements must be met before any such provision may become effective, such additional requirements shall first be met.  If any agency shop clause is permissible in the State where the other provisions of this Article cannot apply, the following agency clause shall prevail:

(1)    Membership in the Union is not compulsory.  Employees have the right to join, not join, maintain, or drop their membership in the Union, as they see fit.  Neither party shall exert any pressure on or discriminate against any employee as regards such matters.

(2)    Membership in the Union is separate, apart and distinct from the assumption by one of his equal obligation to the extent that he receives equal benefits. The Union is required under this Agreement to represent all of the employees in the bargaining unit fairly and equally without regard as to whether or not an employee is a member of the Union. The terms of this Agreement have been made for all employees in the bargaining unit and not only for members in the Union, and this Agreement has been executed by the Employer after it has satisfied itself that the Union is the choice of a majority of the employees in the bargaining unit.

Accordingly, it is fair that each employee in the bargaining unit, pay his own way and assume his fair share of the obligation along with the grant of equal benefit contained in this Agreement.

(3)    In accordance with the policy set forth under subparagraph (1) and (2) of this section, all employees in the bargaining unit shall as condition of continued employment, pay to the Union, the employee's exclusive collective bargaining representative, an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal to the Union's regular and usual initiation fees, and its regular and usual dues. For present employees, such payments shall commence thirty-one (31) days following the effective date or on the date of execution of this Agreement, whichever is the later, and for new employees the payment shall start thirty-one (31) days following the date of employment.

SECTION 6.  UNION NOTICES  Official Union notices may be posted on designated Bulletin Boards or distributed by other mutually agreeable methods.

SECTION 7.  UNION VISITATION  The Local Union Representative, upon proper identification, shall be permitted access during working hours to Employer's premises where any Union member is employed.  In case of a dispute over time worked, he shall have the right to examine the employee's time records.

- 2 -

## ARTICLE 2
## SENIORITY

SECTION 1. Employee's seniority rights shall prevail from the last date of hire. Rent-A-Car Division seniority rights shall prevail from the last date of hire of an employee at the hotel (Fountianbleau, Hotel Intercontinental, and Miami Airport Marriott) and Miami Airport locations in respect to layoff, recall, and location, overtime and vacation preference bidding only. There shall be no seniority rights as to position within a location.

SECTION 2. A list of the employees in the order of their seniority shall be posted in a conspicuous place at their place of employment. Controversies regarding seniority shall be settled by the Employer and the Union. Failing settlement by these parties, the matter shall be processed under the Grievance Procedure set out in Article VIII of this Agreement. Any protest to the seniority list as posted shall be considered correct and final until the next bid. Vacancies created by resignation, termination and sickness will be placed for bid within thirty (30) days.

SECTION 3. Vacancies and all job opportunities at Miami Airport, within the classifications covered by this Agreement, shall be posted for bids three (3) times a year if requested by the Union. There will be one hotel location bid per year if requested by the Union. The employees will be given the opportunity to bid on openings in seniority. Intervening vacancies shall be filled at the Employer's discretion.

SECTION 4. Posting shall be at a conspicuous place at each location so that all eligible employees will receive notice. The posting of vacancies shall include the number of days, classifications, rate of pay, days to be worked and the starting time each day. In addition, at the Miami Airport, the bid posting will state "Check-In Area," "Rental Area," "Gold" and "Express Booth." The Employer, however, reserves the right to move employees between positions and locations on emergency. Posting shall be for a period of five (5) days. Assignments shall be made within three (3) days after the close of the bid. Unfilled openings and those occurring during the eight (8) days shall be filled at the Employer's discretion.

SECTION 5. There shall be no split or staggered shifts for regularly assigned employees.

SECTION 6. UNASSIGNED EMPLOYEES The Employer may use thirty percent (30%) of the total employees as unassigned employees in a location. The thirty percent (30%) shall consist of people who bid unassigned according to seniority and shall include vacation relief. Unassigned employees shall be covered under all conditions and guarantees of this Agreement, except that their work week shall be any five (5) days from Friday through Thursday (five (5) consecutive days at the Airport location). These employees may be worked on any day during the work week to make up their weekly guarantee. Unassigned employees shall be advised at the end of their work day when to

- 3 -

next report for work, and reporting times shall be chosen in order of their seniority. It is understood that employees on vacation relief must fill the vacation opening(s) on a city-wide basis and location percentage will not apply in this regard.

SECTION 7.  An employee shall cease to have seniority rights if:

   (1)    He quits voluntarily.

   (2)    He is discharged for proper cause.

   (3)    He is absent for three (3) consecutive working days without notifying the Employer, unless physically impossible to do so.  If such is the case, the Employer reserves the right to request written medical verification of such inability to notify the Employer.

   (4)    He does not return to work within three (3) working days after being recalled by the Employer by a letter sent by Registered Mail with Return Receipt Requested, addressed to him at the last address he has given the Employer.

   (5)    He exceeds a leave of absence without written approval of the Employer.

   (6)    He is laid off in excess of twelve (12) months.

## ARTICLE 3
## LEAVE OF ABSENCE

SECTION 1.  The Employer agrees to grant necessary time off, without discrimination and without pay, to an employee designated by the Union to attend a Labor Convention, or to serve in any other capacity on other official Union business, provided that a seven (7) days' advance notice of the intention of such designated employee to be absent from the Employer's business shall be given the Employer.  The notice shall specify length of time off.  The Union agrees that such time off request shall not be exercised to the detriment or disruption of the operation of the business.  Employees shall continue to accumulate seniority while taking such authorized time off for Union business.

SECTION 2.  Leave of absence not to exceed six (6) months may be granted to an employee for legitimate personal reasons and without loss of seniority, provided it is justified by mutual agreement of the Employer and the Union.  However, no employee may receive leave of absence to enter into other gainful employment or business enterprise.  Employees shall continue to accumulate seniority while on an authorized leave of absence.

- 4 -

SECTION 3.  Upon providing seven (7) days prior written notice, an employee may be granted leave of absence not to exceed six (6) months, and without seniority loss, for the purpose of accepting full-time job with the Union.

SECTION 4.  Employees accepting management positions under the leave of absence clause will be permitted one (1) leave of ninety (90) days without loss of seniority.  An additional ninety (90) days may be granted if it is agreed upon by the parties.

SECTION 5.  An employee with seniority status who becomes pregnant and who provides the Employer with proper notification and medical certification, will be granted a maternity leave of absence without pay for a fixed period not to exceed six (6) months.  Prior to commencing the leave of absence, the employee shall determine the period of leave by notifying the Employer of the date on which she intends to return to work.   Upon presentation to the Employer of satisfactory medical evidence such leave of absence may be extended for an additional period up to six (6) months.  The leave of absence shall commence at any time upon request of the employee; however, the Employer reserves the right to require the employee to submit periodic medical certification of her ability to perform her regular duties.  The employee must return to work at the conclusion of her approved leave of absence subject to the approval of the attending physician or the Employer's designated physician.  Seniority shall accumulate during the leave.

In the case of maternity leave, all employees, upon certification of the attending physician that the employee is no longer disabled as a result of the pregnancy, may request a "child rearing" leave, providing the following conditions are met:

(a)     The employee must notify the supervisor within four weeks of the date of birth of the child, that she desires a "child rearing leave."

(b)     The employee must submit proof of the child's date of birth.

(c)     The child rearing leave may last only to the point where the child attains the age of six months.

(d)     The returning employee will maintain their seniority in her classification, and shall return to work provided they have more seniority than the least senior employee in the classification.  The employee will give the Company two (2) weeks advance notice of anticipated return.

(e)     The employee will be required to pay the cost of All Benefit Plans for the period of the "child rearing leave."

SECTION 6.  An employee, on leave of absence for any reason in excess of two (2) weeks, upon his return to work will be assigned to the unassigned group by the Employer until the next complete shift bid.  Such employee will become part of the unassigned group

- 5 -

until the next job bid, even if the percentage requirement in Article II, Section 6 is exceeded.

SECTION 7.  The employer agrees to abide by the Family Medical Leave Act of 1993, as a method.

## ARTICLE 4
## MANAGEMENT RIGHTS

SECTION 1.  It is recognized that the conduct of the business, the operation of the Employer, and the direction of the working forces are vested exclusively in the Employer whose direction and judgment shall control as to the selection and retention of employees, and the work and duties to which they are assigned, including the right to hire, transfer, promote, demote, suspend, and discharge and make rules and regulations concerning the conduct of the business and the employees, provided the same are not contrary to the terms of this Agreement.  The failure of the Employer to exercise its rights under this Agreement in any respect shall not be taken as a waiver of its rights.

SECTION 2.  All conditions of employment relating to hours, wages and general working conditions, shall be maintained at not less than the highest minimum standards in effect at the time of the signing of this Agreement as specifically provided for in this Agreement.

SECTION 3.  The Employer is permitted to make and enforce any reasonable rules which do not conflict with the provisions of this Agreement.  All such rules shall be posted for a period of six (6) calendar days before becoming effective and the Union shall be furnished a copy of such rules.

SECTION 4.  In addition to reasonable cause drug/alcohol testing, there will be mandatory testing in all post accidents and any injuries requiring medical attention other than first aid.

## ARTICLE 5
## JOB STEWARDS

SECTION 1.  The Employer recognizes the right of the Union to appoint or elect Job Stewards and Alternates from the Employer's seniority list.  There shall be only one (1) active Steward during each shift at any one (1) time.  The Union must notify the Employer of the names of the Stewards.

SECTION 2.  The authority of Job Stewards and Alternates so designated by the Union shall be limited to and shall not exceed the following duties and activities:

- 6 -

(a)   the investigation and presentation of grievances to his Employer or designated company representatives in accordance with the provisions of the Collective Bargaining Agreement;

(b)   the collection of dues when authorized by appropriate Local Union action;

(c)   the transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers provided such messages and information

  (1)   have been reduced to writing, or;

  (2)   if not reduced to writing  are of a routine nature and do not involve work stoppages, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

SECTION 3.  Job Stewards and alternates have no authority to take strike action or any other action interrupting the Employer's business, except as authorized by official action of the Union.

The Employer recognizes these limitations upon the authority of the Job Stewards and their Alternates, and shall not hold the Union liable for any unauthorized acts.  The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the Shop Steward has taken unauthorized strike action, slowdown, or work stoppage in violation of this Agreement.

## ARTICLE 6
## BONDS

SECTION 1.  Should the Employer require any employee to give bond, cash bond shall not be compulsory, and any premium involved shall be paid by the Employer.  However, if the Employer's regular bonding company refuses to bond any employee and the employee is able to secure a bond elsewhere, said employee shall pay the difference in the premium involved as compared to the premium paid by the Employer for the other employees in the same classification.  Cancellation of a bond after once issued shall not be cause for discharge, unless the bond is canceled due to the employee giving a fraudulent statement in obtaining said bond.

- 7 -

## ARTICLE 7
## DISCHARGE AND SUSPENSION

SECTION 1. Employees shall always present a proper, clean and courteous attitude in public and to customers of the Employer.

SECTION 2. The Employer will not discharge or suspend any employee without just cause and shall give at least one warning (two warnings for tardiness or absentee) of the complaint against such employee in writing to the Union and the employee before he is discharged or suspended (such notice shall expire after six (6) months). Discharge or suspension must be by proper written notice to the employee affected, with a copy sent to the Union. No warning notice need be given in the case of dishonesty, immoral conduct while on duty, being under the influence or possession of intoxicating beverage or narcotics, or the use of either while on duty or on Company property, failure to immediately report any accident which has resulted in personal injury or property damage, permitting unauthorized persons to ride in Employer's vehicles, failure to carry out reasonable instructions that do not conflict with the terms of this Agreement, willful destruction of Employer's or public property or the property of fellow employees, theft, willful falsification of application for employment, becoming involved in a serious motor vehicle accident while driving the Employer's car as a result of negligence or recklessness, refusing to carry out a direct order of a superior, using an Employer's vehicle for personal use without permission, absence for three (3) days or more without notifying the Employer. Such notification shall be by telephone, telegraph, or letter, but must be made to the City Manager to whom the employee reports.

SECTION 3. It is understood that employees not covered under this Agreement shall not perform work within the jurisdiction of the Union, except in the case of an emergency or for purposes of instruction or training or where the complement of regular employees is temporarily reduced by reason of absence not to exceed one (1) day of any employee due to illness or other legitimate reasons, or where the work load is temporarily increased.

## ARTICLE 8
## ADJUSTMENT OF DISPUTES

SECTION 1. Any difference which may arise between the Employer and any employee or the Union involving the interpretation or application of this Agreement, shall constitute a grievance. Every effort shall be made to settle any grievance as expediently as possible in accordance with the following procedure. It is understood that a grievance must be initiated within ten (10) working days, excluding holidays, of the alleged infraction and/or knowledge of same, to be honored by the Company.

STEP 1. A grievance shall first be taken up with the appropriate member of supervision.

- 8 -

STEP 2.  Any grievance which cannot be satisfactorily settled in "Step 1" above shall next be taken up with the City Manager and/or his designated representatives, either through the Steward or other Union officials, or directly by the employee at his option. Such grievance shall be presented to the City Manager in writing within five (5) days after the grievance is alleged to have taken place, and shall be taken up with him by appointment.

STEP 3.  If no satisfactory agreement is reached at Step 2 within five (5) days after it is submitted to the City Manager, and if the Union desires to process the grievance further, the grievance shall be taken up by the Union Representative and the Region Vice President and/or his/her designated representative. Such grievance shall be presented to the Region Vice President in writing within five (5) days after the City Manager has replied to the grievance in Step 2.

STEP 4.  If no satisfactory agreement is reached between the Employer and the Union Representative within five (5) working days after the matter is submitted to the Region Vice President, either party shall have the right to submit said grievance to arbitration, provided that written notice is given within ten (10) additional days of the party's desire to submit the matter to arbitration. In the event that arbitration is requested, it may be referred by either party to the American Arbitration Association for hearing in accordance with the rules of said American Arbitration Association, or to any Arbitrator agreed to by both parties. It is understood the scope of arbitration shall be limited to the interpretation of the provisions of this Agreement and that the decision of the Arbitrator shall be final and binding on both parties.

SECTION 2. The expense and fees of the Arbitrator shall be borne equally by the parties hereto.

**ARTICLE 9**
**PROTECTION OF RIGHTS**

SECTION 1.  NO STRIKE OR LOCKOUT  During the life of this Agreement or any extension thereof, the Employer agrees there shall be no lockouts, and the Union agrees that it will not cause or permit its members to cause or to take part in any strike, slowdown, boycott, stoppage or termination of work. Any employee who does violate this Agreement, or participate in its violation, shall be subject to immediate discharge.

SECTION 2.  It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a labor dispute, or refuses to go through or work behind any picket line, including the picket line of unions party to this Agreement and including picket lines at the Employer's place or places of business.

- 9 -

## ARTICLE 10
## COMPENSATION CLAIMS

SECTION 1.  The Employer agrees to carry Compensation Insurance and to exert all possible means to obtain prompt payments of injury compensation settlements by his compensation insurance carriers.

SECTION 2.  If an employee is injured on the job and requires medical attention and is unable to complete his work shift on that day, the Company shall pay the employee for the remainder of his normal working shift on that day.

## ARTICLE 11
## MILITARY LEAVE OF ABSENCE

SECTION 1.  Any employee who enters into active service in the Armed Forces of the United States will be given a leave of absence for and will accumulate seniority during such period of service, and upon the termination of such service shall be offered reemployment in his previous position or a position of like seniority, status and pay unless circumstances have so changed as to make it impossible or unreasonable to do so, in which event he will be offered such employment as may be available which he is capable of doing at the current rate of such work; provided, he has not been dishonorably discharged, is physically and mentally able to do the work, and reports for work within ninety (90) days of the date of such discharge.

## ARTICLE 12
## PAY PERIODS

SECTION 1.  All regular employees covered by this Agreement shall be paid in full each week.  Not more than seven (7) days shall be held on an employee.  Each employee shall be provided with a statement of his gross earnings and of deductions made for any purpose.

## ARTICLE 13
## UNIFORMS

SECTION 1.   The Employer shall provide, at his expense, sufficient uniforms for employees, including jacket, trousers, shirt and ties for males; jackets, skirts, and blouses for females.  Colors, styling, cloth, etc., to be selected by the Employer.

SECTION 2.  The employee will provide, at his or her expense, stockings and shoes of color, type and cloth as prescribed by the Employer.

- 10 -

SECTION 3.  All employees will be required to wear said uniforms while on duty and present a neat appearance at all times.

SECTION 4.  The employee will wash any and all wash and wear type uniforms, however, the Employer will provide dry cleaning service for any type uniform that needs to be dry cleaned.

## ARTICLE 14
## EXAMINATIONS

SECTION 1.  Any physical or mental examination required by the Employer shall be promptly complied with by all employees, provided, however, the Employer shall pay for all such physical and mental examinations.  The Employer reserves the right to select his own medical examiner or physician and the Union may, if in its opinion it thinks an injustice has been done an employee, have said employee re-examined at the Union's expense. If the two (2) medical examiners or physicians disagree, they shall mutually agree upon a third medical examiner or physician whose decision shall be final and binding on the Employer, employee, and/or the Union.  The charges of the third medical examiner or physician shall be borne equally by the Employer and the Union.

## ARTICLE 15
## JOB CLASSIFICATIONS

SECTION 1.  The job classification shall be as a Counter Sales Representative only, regardless of wages as specified in Appendix "A".  It is understood that a Counter Sales Representative shall be qualified to perform all duties connected with any phase of the operation in their classification of renting or checking in of vehicles, including clerical work assigned as is applicable to their position.

## ARTICLE 16
## HOURS AND WAGES

SECTION 1.  It is understood that because of the unusual nature of the Employer's business the operation shall be on a seven (7) day week basis.  It is further understood that the Employer shall have the right to establish and man shifts, whether it be day, night or Sunday, in order to cover all phases of his business, as long as the working schedule or shifts are five (5) consecutive eight (8) hour days, except for unassigned employees as defined in Article III, Section 7.

- 11 -

SECTION 2.  All time worked in excess of eight (8) hours in one day or forty (40) hours in any one (1) week shall be paid for at the rate of one and one-half (1 ½) times the employee's regular straight time hourly rate of pay.  Any time worked on the sixth (6th) consecutive day worked within the work week will be at the rate of one and one-half (1 ½) times the employee's regular straight time hourly rate of pay.  Any time worked on the seventh (7th) consecutive day worked within the work week will be at the rate of two times (2x) the employee's regular straight time hourly rate of pay.  These provisions shall not be applicable if such work is granted as a result of a shift change.

SECTION 3.  Employees shall be paid in accordance with wages as specified as job classifications in Appendix "A", which has been made a part of this Agreement.

SECTION 4.  Call-In  Employees shall be guaranteed four (4) hours when called back to work after completing their regular work day and/or their regular work week, at their applicable hourly rate.  Upon mutual agreement, the four (4) hour period may be waived.

SECTION 5.  When overtime is required by the Company, it shall be filled in the following manner:

A.   Overtime will be offered by seniority by job classification by location (hotels and airport)  If the overtime is expected to be four (4) or less hours, it will be offered to the most senior employee scheduled to work that day who is available for the overtime.  If no such employee volunteers for this overtime, it will be assigned in reverse order of seniority from that group.  If overtime is expected to be over four (4) hours, employees who are on their day off will be offered the overtime by seniority.  If there are no volunteers, it will be assigned in reverse order of seniority from that group.

B.   When an employee does not want to work overtime at the end of his shift, he must advise his supervisor five (5) hours in advance of the termination of his shift that he does not desire to work overtime that particular day.  The five (5) hour notice will be subject to management approval and whenever possible will be honored.

C.   Employees who are called in to work from their day off, will be guaranteed a minimum of four (4) hours of work or pay.  Upon mutual agreement, the four (4) hour period may be waived.

D.   Employees may bump on daily overtime, provided they have the seniority, on overtime that is an extension of their regular shift, unless they have signed the daily overtime list that signifies their desire not to work voluntary overtime or there is less than one (1) hour of work remaining on the scheduled overtime.

- 12 -

## ARTICLE 17
## HOLIDAYS

SECTION 1. All regular employees hired prior to April 24, 1995 who have completed their probationary period and are covered by this Agreement shall receive the following holidays off, with eight (8) hours pay, at their respective rate of pay:

| | |
|---|---|
| New Year's Day | Easter Sunday |
| Lincoln's Birthday | Labor Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |
| Employee's Birthday | Anniversary Date of Hire |
| Two (2) Floating Holidays | |

All regular employees hired after April 24, 1995 shall not be eligible for holiday pay during their probation period. Thereafter, during the first year of employment, the employee will be entitled to the following holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

During the second year of employment add:

| | |
|---|---|
| Lincoln's Birthday | Anniversary Date of Hire |
| Easter Sunday | Employee's Birthday |

During the third year of employment add:

Two (2) Floating Holidays

An employee wishing to take a "floating holiday" must provide at least one week's written notice prior to the day desired to be taken. No more than one (1) employee may take a "floating holiday" on any one day. Should the Company grant such day it will not be granted prior to twenty-one (21) days of the day requested and should more than one employee request such day it shall be granted to the most senior employee.

SECTION 2. To be eligible to receive holiday pay, the employee must meet the following eligibility rules, unless otherwise provided herein:

    (a)    The employee has seniority as of the date of the Holiday, and

(b)   The employee must have worked his/her last scheduled work day prior to and his/her next scheduled work day after such holiday, unless otherwise agreed upon by the City Manager.

SECTION 3.  For any work performed on any of the above-mentioned holidays, the employee shall receive, in addition to eight (8) hours' holiday pay, time and one-half (1 ½x) his straight time hourly rate for the hours worked on a holiday.  For any of the above-named holidays falling within an employee's vacation period, such employee shall receive an additional day's pay but no additional time off.  The holiday will be celebrated on the date of the holiday.

SECTION 4.  The above paid holidays will be considered as time worked for the purposes of computing overtime as prescribed in Article XVI, Section 2 of the Agreement.

# ARTICLE 18
## VACATIONS

SECTION 1.  An employee's eligibility date for vacation with pay shall be the anniversary of the employee's seniority date.  To obtain a vacation in his first year of employment, the employee must work a minimum of one hundred fifty-six (156) days in the year prior to his anniversary and have been employed for the entire year.  To obtain a vacation during the second (2nd) and subsequent years, the employee must work a minimum of one hundred fifty-six (156) days in each anniversary year, but need not be employed for the entire year. Not more than one vacation will be earned in any twelve (12) month period.

SECTION 2.  All regular employees covered by this Agreement who are eligible for vacation, in accordance with Section 1 above, after one (1) year of employment shall receive a two (2) week vacation with pay at their respective hourly rates of pay. All regular employees who are eligible for vacation, in accordance with Section 1 above, after five (5) years or more of employment shall receive a three (3) week vacation with pay at their respective hourly rates of pay.  Employees will receive four (4) weeks vacation with fourteen (14) years of service.  Vacation pay shall be based on the number of hours regularly worked by each employee and at straight time rate of pay.

SECTION 3.  The vacation period, with due regard to the number of employees off at any one time, will be chosen in seniority.  The vacation period shall be from January 1 through December 31.  The assignment of vacation periods by seniority shall not be permitted to interfere with the efficiency of operations.  An employee's vacation will commence after the employee's days off.

- 14 -

## ARTICLE 19
## SICK LEAVE, JURY DUTY AND FUNERAL LEAVE

SECTION 1(a).  Each employee hired prior to April 24, 1995 and who has been employed for one (1) year shall be entitled to be paid seven (7) days sick leave to be taken during the calendar year (see side letter).  A doctor's certificate may be required by the Employer to substantiate the employee's absence.

SECTION 1(b).  Employees hired after April 24, 1995 shall be entitled to sick leave as follows:

| | | |
|---|---|---|
| During year one (1) | - | 0 days |
| During year two (2) | - | 5 days |
| During year three (3) | - | 7 days |

SECTION 2.  All unused paid sick leave (up to a maximum of seven (7) days) shall be paid out in December (see side letter).

SECTION 3.  Any employee called for Jury Duty shall be paid the difference between the pay received for such duty, and whatever earnings he loses as a result of such Jury Duty.

SECTION 4.  Three (3) days paid Funeral Leave shall be granted because of a death in the immediate family of the employee.  Immediate family is:  Mother, Father, Husband or Wife, Son, Daughter, Sister, Brother, Grandmother, Grandfather, Step-Mother, Step-Father, Grandchild, Mother-in-Law and Father-in-Law.  One (1) additional day will be provided for the employee's parents, spouse, or child.


## ARTICLE 20
## HEALTH AND WELFARE

SECTION 1.  Employees covered by this Agreement will be covered by the Hertz Custom Benefit Program Plan as modified.  The terms and conditions of the Hertz Custom Benefit Program Plan as modified shall be revised from time to time and such revisions will automatically be extended to employees covered by this Agreement at the earliest feasible date but not later than six (6) months from the date of such revisions.

SECTION 2.  If an employee is absent because of illness or off-the-job injury, the Employer shall continue to make contributions to the Health and Welfare Fund for a period of six (6) weeks.  If an employee is injured on the job, or on layoff, the Employer shall continue to make contributions to the Health and Welfare Fund for a period of twelve (12) months. This applies to regular employees who are presently employed as of August 7, 1985.

## ARTICLE 21
## PENSION PLAN

SECTION 1.  Employees covered by this Agreement shall be included in the Hertz Retirement Plan dated August 29, 1985 as amended.  The terms and conditions of such plan shall be revised from time to time and such revisions will be automatically extended to employees covered by this Agreement at the earliest feasible date but no later than six (6) months from the date of such revisions.  No matter relating to the terms and conditions of such plan is subject to the Grievance and Arbitration provisions of this Agreement.

## ARTICLE 22
## PART-TIME EMPLOYEES

SECTION 1.  The Employer, at its discretion, may employ persons in the classifications covered by this Agreement on a part-time basis.  Such employees will be covered by the terms of the Agreement with the following exceptions:

(a)     A part-time employee will be paid holiday pay only if they would have been scheduled to work on the holiday and only in the amount equal to the hours they would have been scheduled to work.  If the part-time employees work on a holiday they will be paid straight time at their regular rate for the hours worked in addition to the above, if applicable.

(b)     Part-time employees will accumulate vacation in accordance with the Agreement except that vacation pay will be computed based on their regular straight time hourly rate for the average hours worked per week during the preceding thirteen (13) weeks.

(c)     The Employer will determine the hours to be worked by part-time employees.  A part-time employee who refuses to work the scheduled hours is considered to have resigned.  A part-time employee need not be assigned five (5) consecutive workdays, however, hours worked in excess of forty (40) in any one week will be paid at time and one-half (1 ½x) the employee's regular straight time hourly rate of pay.

(d)     Part-time employees in a classification will be laid off in order of seniority prior to the regular full-time employees.  Part-time employees will be recalled in order of seniority to work hours scheduled by the Employer.  The Employer shall employ regular full-time employees prior to recalling part-time employees.

(e)     Part-time employees are included in the "Wages" "Recognition" and "Check-Off" provisions of this Agreement, however, part-time employees are

- 16 -

excluded from all other terms and conditions of the Agreement which are not specifically amended by this Article.

(f)     No combination of part-time employees shall be used to eliminate full-time employees.

(g)     The maximum number of part-time employees cannot exceed twenty-five (25) percent of the total work force covered by the Counter Sales Representative Labor Agreement.

(h)     Such work force cannot be scheduled more than twenty-five (25) hours per week.

(I)     Part-time employees will not be used to cover overtime that is directed by the company. It being understood that proof of a weekly schedule of hours for part-time denies the request for overtime claim by a regular employee.

(j)     A full time employee may go to part-time and hold their seniority for three (3) months, one (1) time in their career. If after three (3) months as a part-time employee the employee wants to go back to full time, the employee would go to the bottom of the seniority list.

## ARTICLE 23
## TEAMSTERS NATIONAL 401(K)

The Company hereby agrees to participate in the Teamsters-National 401(K) Savings Plan (the Plan) on behalf of all employees represented for purposes of collective bargaining under this agreement.

The Company will make or cause to be made payroll deductions from participating employees' wages, in accordance with each employee's salary deferral election subject to compliance with ERISA and the relevant tax code provisions. The Company will forward withheld sum to State Street Bank or its successor at such time, in such form and manner as required pursuant to the Plan and Declaration of Trust (Trust).

The Company will execute a Participation Agreement with Local 390 and the Trustees of the Plan evidencing employer participation in the plan effective prior to any employee deferral being received by the Plan.

In addition, the Company agrees to require the payroll system to provide separate paycheck deductions so that the Plan may allow participant loans. The Company further agrees, at such time as it is administratively feasible, to require the payroll system to provide separate payroll deductions so that the Plan may allow after-tax contributions.

- 17 -

## ARTICLE 24
## TERMINATION

SECTION 1.  This Agreement shall be in full force and effect from August 7, 2000 to and including August 6, 2003, and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to date of expiration.

SECTION 2.  Where no such cancellation or termination notice is served and the parties desire to continue said Agreement, but also desire to negotiate changes or revisions on this Agreement, either party may serve upon the other a notice at least sixty (60) days prior to August 6, 2003, or August 6th of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement.

SECTION 3.  Revisions agreed upon or ordered shall be effective as of August 7, 2000 or August 7th of any subsequent contract year.  The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon.

SECTION 4.  In the event of an inadvertent failure by either party to give notice set forth in Sections 1 and 2 of this Article, such party may give such notice at any time prior to the termination or automatic renewal date of this Agreement.  If a notice is given in accordance with the provisions of this Section, the expiration date of this Agreement shall be the sixty-first (61st) day following receipt of such notice.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals this ___ day of _____, 2000 to be effective as of August 7, 2000.


**THE HERTZ CORPORATION**
Rent-A-Car Division
Miami, Miami Airport, Miami Beach
Dade County, Florida

**FREIGHT DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 390**
Miami, Florida


BY: _____

BY: _____

- 18 -

# APPENDIX "A"

A part of the Agreement for the period of August 7, 2000 to and including August 6, 2003, between the Hertz Corporation, a Delaware Corporation, as specifically applying to its Rent-A-Car Stations located in Miami, Miami Airport and Miami Beach, Dade County, Florida, and Freight Drivers, Warehousemen and Helpers Local Union No. 390, an Affiliate of the INTERNATIONAL BROTHERHOOD OF TEAMSTERS.

1.    **JOB CLASSIFICATIONS AND MINIMUM HOURLY WAGE RATES**

   Counter Sales Representatives

|            | 8/7/00 | 8/7/01 | 8/7/02 |
|------------|--------|--------|--------|
| Start      | $7.50  | $7.75  | $8.00  |
| 3 months   | 8.00   | 8.25   | 8.50   |
| 6 months   | 8.25   | 8.50   | 8.75   |
| 12 months  | 8.50   | 8.75   | 9.00   |

   Any employee with two (2) or more years of service as of the dates below will receive the following increases:

| 8/7/00 | 8/7/01 | 8/7/02 |
|--------|--------|--------|
| 50¢    | 50¢    | 50¢    |

2.    All Counter Sales Representative Lead Persons may be appointed at the sole discretion of the Employer and will be paid forty (40) cents per hour in addition to his regular hourly rate of pay for each hour so worked. The number, if any, hours of work and location is at the sole discretion of the Employer.

3.    Employees whose shifts start on or after 3 p.m. will receive 50¢ per hour above their regular rate of pay.

**THE HERTZ CORPORATION**
Rent-A-Car Division
Miami, Miami Airport, Miami Beach
Dade County, Florida

**FREIGHT DRIVERS, WAREHOUSEMEN
AND HELPERS, LOCAL UNION NO. 390**
Miami, Florida

BY: _____

BY: _____

A-1

August 28, 2000

Ms. Gerry Pape
IBT Local Union No. 390
2940 N.W. Seventh Street
Miami, FL   33125

Dear Ms. Pape:

This "letter of understanding" shall consolidate previous such correspondence and shall become part of the labor agreement between Hertz Rent-A-Car, Miami, Florida, and Teamsters Local Union No. 390, Miami, Florida, covering Rental Representatives and Reservationists. It shall remain in full force and effect from August 7, 2000 to and including August 6, 2003.

1. When the Company schedules a work force for any of the holidays enumerated in Article 17, the work will be offered by seniority to those employees regularly scheduled to work that day.  If a senior employee(s) declines the work, junior employee(s) regularly scheduled to work that day will be required to work the unfilled shifts by seniority.

2. It shall be understood that an employee who is either injured on the job and sent home from work as a result of such injury, and/or any employee who is requested to work on a holiday, does report to work, and is then requested by his/her supervisor to go home and does leave short of eight (8) hours worked, shall be considered to have worked a full eight (8) hour day on each of those days for the purposes only of calculating overtime on the sixth (6th) and seventh (7th) consecutive days worked in the work week, as set forth in Article 16, Section 2 of the Agreement.

3. If an employee receives a customer complaint letter, the Company will investigate such letter as to credibility and allow the employee opportunity to present his/her version.

- 1 -

4.  Absences or tardiness approved by the manager in advance will not be included when determining whether or not an employee deserves a letter of warning for absenteeism or tardiness.

5.  When an employee works an additional shift, mandatorily or voluntarily, the employee will be allowed a paid lunch period of thirty (30) minutes only if such additional shift is at least five (5) hours in length (said lunch period is not to be considered part of the five (5) hours).  Said lunch period shall be taken by the employee between the third and fifth hours worked in the additional shift as determined by management.

6.  It is understood by the parties signatory to this agreement that the word "possession" as it applies to alcohol does not encompass any gift given to employees provided a manager is aware of such gift.

7.  The Company will continue to use part time Instant Return Representatives as it has in the past and will have the right to hire up to five (5) full time Instant Return Representatives who will not have to be trained as Customer Service Representatives.

8.  In order to convert sick days from an anniversary to calendar year basis the following will apply:  Employees will receive their normal pay out for unused days on their anniversary in 2000.  In addition, employees will receive a prorated payment for unused days in December 2000 based upon the number of months between their anniversary date and December 31, 2000.  Any sick days used over the prorated amount will not be paid.  Effective January 1, 2001 sick days will be taken on a calendar year basis with unused sick days paid out in December.

The above fully expresses the understanding between the Company and the Union, and there shall be no other meaning neither expressed nor implied.

**Freight Drivers, Warehousemen
and Helpers Local Union No. 390**
Miami, Florida, an Affiliate of
The International Brotherhood of
Teamsters

BY: _____

**THE HERTZ CORPORATION**
Rent-A-Car Division
Miami, Florida

BY: _____

- 2 -

# EXHIBIT B

*Rose Gillard, et al. v. Toni Ziccardi, et al.*
**Affidavit of Toni Ziccardi**

CONSTANGY, BROOKS & SMITH, LLC
(813) 223-7166

## *SETTLEMENT AGREEMENT*

This Settlement Agreement (hereinafter the "Agreement") is entered into by and between Teamsters Local Union No. 390 (hereinafter "Local 390") and The Hertz Corporation (hereinafter "Hertz"), duly acting under authority of its officers and directors.

**WHEREAS**, certain disputes have arisen between the parties with respect to grievances filed against Hertz over the termination of bargaining unit members: Carmen Raposo, Louis Garcia, Angela Vargas, Zanobia Ostheimer, Flor Saenz, Kenneth Rubi, Laura Crosky, Julio Pacheco, Bessy Morales, Vilma Narvaez, Gladys Page, Rose Blanchard, Susan Taylor, Jorge Llamas, Lucy Paez, Miguel Silva, Alejandro Urbina, Donna Swift, Michelle DeCorte, Rose Gillard and Paula Rivera;

**WHEREAS,** Local 390 initiated arbitration proceedings against Hertz, in accordance with the Rules and Regulations of the American Arbitration Association regarding the terminations of the above referenced bargaining unit members (the "Arbitrations"); and

**WHEREAS,** the parties desire to compromise and conclude all claims and controversies pending in the Arbitrations, as well as any and all claims and controversies regarding other affected bargaining unit members (Eddie Diaz, LaSonya Salone, Robert Contreras, Christina Tavarez and Elizabeth Raposo), upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and agreements stated herein, and for further good and valuable consideration, receipt of which is acknowledged herein, the parties stipulate and do mutually agree as follows:

- 1 -

1.     All of the following Arbitrations are withdrawn and dismissed by the union with prejudice with each party bearing its own costs and splitting any cancellation costs [AAA Case Nos. 32-300-00498-02 (G. Page), 32-300-00499-02 (R. Blanchard), 32-300-00497-02 (S. Taylor), 32-300-00496-02 (J. Llamas), 32-300-00495-02 (L. Paez), 32-300-00028-02 (V. Narvaez), 32-300-00257-02 (B. Morales), 32-300-00254-02 (J. Pacheco), 32-300-00249-02 (L. Crosky), 32-300-00418-02 (K. Rubi), 32-300-00259-02 (A. Vargas), 32-300258-02 (R. Gillard), 32-300-00276-02 (C. Raposo), 32-300-00424 (L. Garcia), 32-300-00262 (Z. Ostheimer), 32-300-00250 (F. Saenz), 32-300-00263 (A. Urbina), 32-300-00251 (M. DeCorte), 32-300-00254-00 (M. Silva) and 32-300-00260 (P. Rivera).

2.     Subject to Paragraph 4 below, the following terminated employees will be reinstated to employment with Hertz pursuant to the terms and conditions below and with no back pay but without a break in their seniority: Carmen Raposo, Louis Garcia, Angela Vargas, Zanobia Ostheimer, Flor Saenz, Rose Blanchard, Susan Taylor, Jorge Llamas, Lucy Paez and Gladys Page (the "Reinstated Employees"). All other terminated employees will not be reinstated.  The Company agrees to amend the personnel record of any of the terminated employees to reflect a resignation of employment if the terminated employee submits such a request in writing to the Company and Local 390 by no later than October 1, 2002.  For those terminated employees choosing to resign, the Company shall respond to all inquiries or reference requests that said employee resigned.

3.     All of the Reinstated Employees will be reinstated pursuant to what Hertz deems to be business necessity and as Hertz Counter Sales Representative positions become available at Miami International Airport.  That notwithstanding, but subject to Paragraph 4 below, all of the Reinstated Employees will be reinstated on or before December 1, 2002.  The Reinstated Employees will be reinstated in the order set forth in Paragraph 2 above.  Each Reinstated Employee must report to work within one calendar week from when Local 390 and/or the Reinstated Employee receives written notification of reinstatement from Hertz.  Failure of a

- 2 -

Reinstated Employee to report to work within that time period will be considered a failure to accept an offer of employment which is not subject to the grievance procedure. Any Reinstated Employee not reinstated before December 1, 2002 due to attrition or business necessity, will be offered reinstatement pursuant to bumping rights over the least senior Counter Sales Representatives employed at that time.

4.      Prior to their reinstatement, each Reinstated Employee will enter into a Last Chance Agreement with Hertz and signed by Local 390 in the form that is made a part of this Agreement at Attachment A and enter into a General Release of All Claims that is made a part of this Agreement at Attachment B. No Reinstated Employee will be reinstated until they have signed both documents and the General Release of All Claims becomes effective.

5.      Each Reinstated Employee agrees to cooperate with Hertz during working hours in the defense of any remaining arbitrations or the prosecution of any civil suits regarding the diversion of customers to competitors and/or the receipt of monies from competitors by Hertz employees.

6.      Local 390 herein withdraws with prejudice the grievance filed on behalf of Eddie Diaz. Local 390 also agrees that grievances have not and will not be filed over the terminations of LaSonya Salone and Robert Contreras.

7.      Based upon the evidence obtained, Hertz intends to terminate Christina Tavarez and Elizabeth Raposo. Local 390 agrees not to grieve these terminations in consideration of Hertz allowing Tavarez and Raposo to complete their long term disability leave and being given an opportunity to resign prior to being terminated.

8.      Local 390 herein agrees to withdraw with prejudice the following additional pending arbitrations:   Managers Performing Bargaining Unit Work (AAA Case No. 32-300-00253-02) and Insurance Dates (AAA Case No. 32-300-00261-02).

9.      The parties further declare and represent that no promise, inducement, or

- 3 -

agreement not herein expressed has been made to them, and that this Agreement contains the entire agreement between the parties hereto, and that the terms of this Agreement are contractual and not a mere recital.

10.    This Agreement may not be changed, modified, or rescinded except in writing, signed by all parties hereto and any attempt at oral modification of this Agreement shall be void and of no force or effect.

11.    The parties agree and warrant to each other that they have not made or suffered to be made any assignment or any transfer of right, claim or cause of action herein purported to be released.

12.    This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior agreements or understandings between them.

13.    This Agreement may be executed in multiple or duplicate copies and each such executed copy shall be deemed to be an original.

IN WITNESS HEREOF, and intending to be legally bound hereby, I have hereunto set my hand.

TEAMSTERS LOCAL UNION NO. 390     DATE: 9/25/02
BY:

THE HERTZ CORPORATION
BY:                                DATE: 9/25/02

- 4 -

# *GENERAL RELEASE OF ALL CLAIMS*

In consideration of the mutual promises, covenants and agreements stated below, and specifically in consideration of The Hertz Corporation ("Hertz") reinstating my employment, and as part of the Settlement Agreement between Hertz and the International Brotherhood of Teamsters Local 390 ("Local 390") dated _____, and intending to be legally bound, I _____, (Releasor) do hereby, for myself and my heirs, executors, administrators, successors, and assigns, hereby release, acquit, and forever discharge and hold harmless Hertz and its divisions, subsidiaries, affiliated companies, successors, assigns, officers, directors, parent, employees, benefit and retirement plans (as well as trustees and administrators thereof), and any persons, firms or corporations in privity with any one of them, and Teamsters Local 390, its officers, agents and employees (Releasees), of and from any and all causes of action, claims, demands, compensation, expenses, promises, covenants, and damages of whatever kind or nature, in law or in equity, which I have, had or could have asserted, known or unknown, at common law or under any statute, rule, regulation, order or law, whether federal, state or local, or on any grounds whatsoever, including without limitation;   any and all claims for severance pay, vacation pay, bonus or other compensation; any and all claims of discrimination or harassment based on race, color, national origin, ancestry, religion, marital status, sex, sexual orientation, disability, handicap, age, gender or other unlawful discrimination;   any claims pursuant to the Florida Civil Rights Act;   any claims concerning breach of the collective bargaining agreement between Hertz and Local 390 and said parties' performance and obligations thereunder;   or under any other state, federal, local or common law, with respect to any event, matter, **claim, damage or injury arising** out of Releasor's termination and reinstatement of employment with Hertz.

Releasor further declares and represents that he/she has not filed or otherwise pursued any charges, complaints, lawsuits or claims of any nature against Hertz or any of

- 1 -

its subsidiaries, affiliates or divisions, arising out of or relating to events occurring prior to the date of this Agreement, with any federal, state or local governmental agency or court with respect to any matter covered by this Agreement. In the event that any charges, complaints, lawsuits or claims of any such nature have been filed on my behalf, I shall take every necessary step to insure that said charges, complaints, lawsuits or claims be withdrawn immediately.

Excluded from this release are any claims which cannot be waived by law, including, but not limited to, the right to file a charge with or participate in an investigation conducted by certain government agencies and any claims for workers' compensation, pension, or disability benefits that may have arisen prior to the reinstated employee's termination and any claim for unemployment compensation. I am waiving, however, the right to any monetary recovery should any agency (including, but not limited to, the Equal Employment Opportunity Commission) pursue any claims on my behalf.

Releasor hereby affirms and acknowledges that he/she has read the foregoing General Release of All Claims, that he/she has been given at least forty-five days to review, consider and accept this Agreement although he/she may accept it at any time within those forty-five days. Releasor also understands that he/she has seven days after signing the Agreement  to revoke it by delivering to Louis R. Franzese, Senior Staff Counsel, The Hertz Corporation, 225 Brae Boulevard, Park Ridge, New Jersey 07656, written notification of such revocation within the seven day period. If the Agreement is not specifically revoked, it will become effective and irrevocable on the eighth day after Releasor signs it (the "Effective Date").

Releasor hereby affirms and acknowledges that he/she has had sufficient time and opportunity to review and discuss this General Release of All Claims with his/her

attorney, and that Releasor fully understands and appreciates the meaning of each of its terms, and that it is a voluntary, full and final compromise, release and settlement of all claims, known or unknown, with respect to his/her employment with Hertz, and/or the termination of that employment relationship, and/or any other claim, matter or event relating to that employment relationship

IN WITNESS HEREOF, and intending to be legally bound hereby, I have hereunto set my hand.

_____          DATE: _____

THE HERTZ CORPORATION

BY: _____          DATE:_____

- 3 -

## Last Chance Agreement

This Last Chance Agreement is entered into by and between _____ (hereinafter "_____" or "Employee"), the International Brotherhood of Teamsters Local 390 (hereinafter "the Union") and The Hertz Corporation (hereinafter "Hertz" or "the Company") collectively referred to hereinafter as "the Parties" as part of the Settlement Agreement dated _____*9/25/02*_____ ("Agreement") between the Union and Hertz.

In consideration of the mutual promises, covenants and agreements stated herein and stated in the Settlement Agreement, the parties stipulate and do mutually agree as follows:

1. On or before December 1, 2002, _____ will be reinstated to his/her former position as a Counter Sales Representative at Miami International Airport.

2. _____'s reinstatement shall be on a last chance basis, and should Employee commit any violation of the Hertz Employee Rules and Regulations (excluding attendance and tardiness violations) for a period of one year from the date Employee is reinstated, his/her employment will be terminated without recourse to the grievance procedure under the Collective Bargaining Agreement between the Union and Hertz.

3. _____ shall cooperate during working hours with Hertz in the defense of any other arbitrations or in the prosecution of any civil suits regarding the diversion of customers to competitors and/or the receipt of monies from competitors by Hertz employees.

It is further agreed that this Last Chance Agreement is entered into on a non-precedent setting basis and may not be cited with regard to any other matter.

_____          _____
Employee                                                          Date

_____          _____
International Brotherhood of Teamsters                  Date
Local 390

_____          _____
The Hertz Corporation                                         Date