Filed by S.T.
ELECTRONIC

Dec 6 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ROSE GILLARD, LAURA CROSKEY,
MICHELLE DECORTE, BESSY
GUADALUPE, JULIO PACHECO,
PAULA J. RIVERA, KENNETH F. RUBI,
DONNA SWIFT, and ANGELA VARGAS,

          Plaintiffs,

v.

TONI ZICCARDI, individually, DAVID
GAW, individually, and THE HERTZ
CORPORATION, a Delaware Corporation,

          Defendants.

Civil Case No. 04-CV-20491-KING
MAGISTRATE JUDGE O'SULLIVAN

**DEFENDANT'S STATEMENT OF FACTS IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

**I. STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.

Defendant The Hertz Corporation ("Hertz") has an automobile rental operation at the Miami International Airport. (Ziccardi Decl., ¶ 2)

2.

Prior to their respective terminations from Hertz, Plaintiffs[1] were each employed by Hertz as Customer Sales Representatives ("CSRs") at the company's Miami Airport car rental operation. In these positions, Plaintiffs were responsible for transacting rentals with Hertz' customers. (Ziccardi Decl., ¶ 3).

3.

As CSRs, the terms and conditions of Plaintiffs' employment were established by a Collective Bargaining Agreement  ("CBA") between Hertz and Teamsters Local Union 390.

---

[1] The word Plaintiffs refers to the named Plaintiffs collectively. Each individual Plaintiff will be referred to by her last name, i.e. Rose Gillard will be referred to as Gillard.

(Ziccardi Decl., ¶ 4, Exh. 1). Pursuant to the terms of the CBA, Hertz reserved the right to establish "Rules and Regulations" applicable to all employees, including Plaintiffs. (Id. at Exh. 1)

4.

Hertz' "Rules and Regulations" include among the list of offenses warranting immediate discharge: (1) accepting monies from competitors for referrals or working for a competitor; and (2) theft, dishonesty or participation in any activity which interferes with the employer's operations. (Ziccardi Decl., ¶ 6, Exh. 2). In addition, the CBA also permits Hertz to terminate employees for committing acts of dishonesty while on duty and failing to carry out reasonable instructions without providing the employee with a prior warning. (Ziccardi Decl. at Exh. 1, Article 7).

5.

During their employment with Hertz, each Plaintiff signed an acknowledgement for the receipt of Hertz' "Rules and Regulations," which stated that they acknowledged and understood the policies contained therein and agreed to abide by them as a condition of employment. (Ziccardi Decl., ¶ 8, Exh. 3).

6.

Plaintiffs admit that they each were aware of Hertz' policies against accepting monies for the referrals of customers to competitors. (Croskey Dep. at 19; Gillard Dep. at 64-65; Swift Dep. at 59; Vargas Dep. at 6).

7.

On August 7, 2000, Carline Williams ("Williams"), a CSR employed by Hertz at its Miami Airport rental operation, was terminated by Hertz for violations of the company's "Rules and Regulations" relative to accepting monies from competitors and dishonesty. (Ziccardi Decl., ¶ 14).

8.

The events leading to Williams' termination are as follows:

(a)     On or about July 6, 2000, Toni Ziccardi, City Manager over the Miami airport rental operation, was asked by Robert O'Day, Regional Vice President, to

2

|     |     |
| --- | --- |
|     | investigate a complaint that Moises Behar, Director of Marketing, had received regarding an international customer being referred to Hertz' competitor, VIP Rent-A-Car, Inc. ("VIP").  (Ziccardi Decl., ¶ 9, Exh. 4); |
| (b) | At or about the same time, Jeff Phillips, a Manager at the Miami rental operation, advised Ziccardi of his concerns that CSRs were referring customers to competitors in exchange for cash payments and he specifically identified Williams as an individual who had been named by other employees as engaging in such practices; Miller confirmed his concerns in a July 13, 2000 memorandum to Ziccardi.  (Ziccardi Decl., ¶ 10, Exh. 5); |
| (c) | Ziccardi contacted Larry Miller, Security Manager for the Miami Airport operation, and requested that he investigate whether CSRs were referring customers to Hertz' competitors in exchange for cash payments.  (Ziccardi Decl., ¶ 11); |
| (d) | Miller gathered phone records of calls to competitor phone numbers for a two-week time period, which reflected that most such calls had been placed from the extensions of Williams, as well as Miguel Silva and Jonathan Fratamico, two other CSRs at the Miami Airport rental operation.  (Ziccardi Decl., ¶ 11); |
| (e) | Miller also reviewed tapes from Hertz' surveillance cameras to confirm that Williams and Silva were, in fact, placing the number of phone calls that were reflected in the telephone reports.  In the case of Williams, Miller concluded that during a two-week time period, she had place 140 calls to Hertz' competitors.  (Ziccardi Decl., ¶ 12); |
| (f) | Ziccardi, who had only been the City Manager in Miami for a little more than a month, reviewed Williams' personnel file and discovered a complaint letter from a customer regarding Plaintiff's referral of the customer to a competitor and their being charged an exorbitantly high rental price.  (Ziccardi Decl., ¶ 9, Exh. 5). |

9.

Williams, Silva and Fratamico were all terminated in August 2000 for accepting money from competitors for referrals and dishonesty for denying such conduct. (Ziccardi Decl., ¶¶ 14, 15).

10.

Immediately following Williams's termination in August 2001, Teamsters Local Union 390 filed a grievance protesting her discharge. (Ziccardi Decl., ¶ 16). This grievance proceeded to arbitration in 2001. (*Id*.)

11.

Subsequent to the terminations of Williams, Silva and Fratamico, Hertz continued its investigation into the referral of customers to competitors by Hertz CSRs in exchange for cash payments. The activities in this regard included:

(a) A further review of phone logs for the time frame January 1 through July 15, 2000, which reflected that approximately 13,400 phone calls had been placed from Miami CSR extensions to Hertz' competitors, and that these phone calls were placed from the extensions of not only Williams, Silva, and Fratamico, but also from other work stations shared by many CSRs, including Plaintiffs Gillard and Vargas; (Ziccardi Decl., ¶ 17);

(b) Conversations with the owners of several Hertz' competitors who either admitted paying CSRs for referrals or refused to say whether or not they were doing so. (*Id*.);

(c) Discussions with CSRs who volunteered information regarding other employees accepting cash payments for referrals; and (*Id*.)

(d) A review of financial records that revealed an increase in gross revenues of more than $1,000,000 after the scheme was discovered and stopped, which increase Hertz concluded was not the result of any market factors such as increased business. (*Id*.).

4

12.

In November 2000, Hertz filed suit against Williams, Silva and Fratamico seeking recovery of lost profits caused by their referral of customers to competitors, and in August 2001, amended that action to add as defendants the competitors of Hertz who had paid referral fees to CSRs. Among these was Excel Car Rental ("Excel"). (Gaw Decl., ¶ 4).

13.

As part of its discovery in the above-described amended action, Hertz requested and received from Excel cash receipts reflecting payments to Williams, Silva and Fratamico, as well as other named CSRs, including Plaintiffs herein. On January 30, 2002 Hertz deposed Wellington Williams, one of the owners of Excel. During the deposition, he specifically identified Williams, who was present in the room, as an individual to whom payments were made for the referral of customers. (Wellington Williams Dep., p. 24).

14.

Members of Hertz' management compared the signatures on the Excel receipts with known signatures in Plaintiffs' personnel files, as well as the files of the other CSRs implicated by the receipts. (Gaw Decl., ¶ 6). Based upon these comparisons, Gaw and other Hertz managers concluded that Plaintiffs, and other CSRs, signed the receipts. (Gaw Decl., ¶ 7).

15.

Hertz retained Kenneth Robinson, Sr. ("Robinson"), a private investigator, to assist with its internal investigation of the referral scheme. (Gaw Decl., ¶ 8). Gaw and his department interviewed all of the CSRs implicated by the Excel receipts, including Plaintiffs. Robinson attended most of the interviews. He did not attend the interview of Swift. (Gaw Decl., ¶ 9). On the basis of the Excel receipts, coupled with phone records and interviews of Plaintiffs' co-workers, Hertz terminated 24 CSRs between February and June of 2002 for accepting payments from competitors for referrals. Included in this group of 24 were the Plaintiffs herein. (Gaw Decl., ¶ 11).

16.

Following the investigation, Hertz retained handwriting experts to confirm the authenticity of the signatures on the receipts. (Gaw Decl., ¶ 12). Linda Hart, one of the

5

handwriting experts, confirmed that each Plaintiff either signed at least one receipt or that there were significant similarities between the Excel receipts and the known signatures, supporting Hertz' determination as to each Plaintiff. (Gaw Decl., ¶ 13).

17.

Of the 24 CSRs terminated between February and June 2002, 22 CSRs filed grievances pursuant to the grievance/arbitration provisions of the CBA. This included grievances filed by two CSRs that confessed to accepting monies for referrals during their interviews with Gaw. (Gaw Decl., ¶ 14). As part of each grievance, the CSRs sought reinstatement and back pay for their terminations. (Gaw Decl., ¶ 15). Additional grievances were filed over the termination of the CSRs' insurance benefits. (Id. at 16).

18.

On September 25, 2002, Hertz and the Union entered into a Settlement Agreement resolving 20 grievances filed over the CSRs' terminations, including the grievances filed for the instant Plaintiffs. The Settlement Agreement also resolved the CSRs' grievances challenging the termination of the their benefits and lost wages. (Gaw Decl., Ex. 19). The Union dismissed the grievances filed for the two CSRs who confessed to taking monies for referrals during the interviews prior to reaching the Settlement Agreement. (Gaw Decl., ¶ 18).

19.

Pursuant to the Settlement Agreement, Hertz and the Union agreed, in pertinent part, that (1) all arbitration proceedings from the above-described grievances were withdrawn and dismissed by the Union; (2) certain of the terminated employees, including Plaintiff Angela Vargas, were offered reinstatement to employment with Hertz, subject to meeting certain specified terms and conditions, including execution of a General Release of All Claims, and a Last Chance Agreement; (3) certain of the terminated employees would not be reinstated, including the other Plaintiffs herein, although pursuant to a timely request from the employee, those Plaintiffs' personnel records were subject to modification, so that instead of discharge, their record would reflect a resignation; and, (4) the Reinstated Employees, including Plaintiff Angela Vargas, would cooperate with Hertz in defending any remaining arbitrations or the prosecution of any civil suits arising out the conduct underlying the above-described

6

terminations. (Gaw Decl., ¶ 20).

20.

As required by the Settlement, all of the Plaintiffs, except Vargas, were offered the opportunity to have their terminations reclassified as resignations; however, none of the Plaintiffs submitted the necessary paperwork and their terminations were not reclassified. (Gaw Decl., ¶ 21). As required by the Settlement, the Union dismissed all of the grievances including those seeking extensions of insurance benefits. This settlement was binding on Hertz, the Union, and the individual CSRs who filed the grievances. (Gaw Decl., ¶ 23).

21.

Prior to the interviews, as indicated in paragraph 15 above, Williams' arbitration had already had two days of hearings in February and August 2001. (Ziccardi Decl., Exh. 7, p. 2). The arbitration continued again in November 2002. (*Id*.) Hertz never deposed or subpoenaed Plaintiffs' in an effort to obtain their testimony for the arbitration prior to the interviews in February 2002 or after Plaintiffs were terminated. (Ziccardi Decl., ¶ 18).

22.

Hertz never attempted to depose Plaintiffs for its lawsuit against Williams that was filed in November 2000. (Gaw Decl., ¶ 24).

23.

During the investigation which preceded their respective discharges and while the Carline Williams arbitration was pending, Plaintiffs claim that the following events occurred:[2/]

    (a)    According to Croskey: (1) No one asked her to lie with respect to any information, or testimony, she could provide about Carline Williams' involvement in the referral scheme. (Croskey Dep., pp. 96-97); (2) she was asked by David Gaw, Hertz' Regional Employee Relations Manger, "[If she knew] anything about Carline" and claims to have been told by Gaw that if "you give us something…you will keep your job." (Id. at 69-71, 89-90, 96-100); (3) Gaw told her that he had information reflecting that she had accepted monies from

---

[2/]    For the sake of this Motion only, Hertz accepts as true Plaintiffs' testimony as described in paragraph 23 above.

7

competitors for the referral of Hertz customers. (Id. at 62-63); and, (4) at the time of the above quoted statements, she had no reason to think that Gaw accepted as true her denials regarding participation in the scheme, and, in fact, Gaw told her that he had evidence to the contrary. (Id. at 70-71, 90);

(b) According to Swift: (1) During her meeting with Gaw, no one asked her to lie, attempted to get her to lie or even asked her to testify in any proceedings involving the referral schemes (Swift Dep., p. 79); (2) there was one occasion where Ziccardi allegedly told her that if she testified against Carline Williams she would have job security (Swift Dep., pp. 83-85); and (3) she had no reason to believe that Ziccardi accepted as true Williams' denial of involvement in the referral scheme and, (Swift Dep, p. 85), in fact, Ziccardi sincerely believed that Williams was involved. (Ziccardi Decl., ¶ 21).

(c) According to Vargas: (1) Gaw and Robinson showed her receipts which they told her they believed she had signed for the acceptance of referral fees and, thereafter, said to her "we already know the truth, if you can give us any information, things will go easier for [you]" (Vargas Dep., pp. 33-34); (2) the next thing she recalls from the meeting was being asked if she knew the difference between a termination and a resignation and "that if [she] knew or remembered anything to please let them know…" (Vargas Dep., pp. 35.); (3) at some point prior to the meeting with Gaw and Robinson, Ziccardi had a conversation with her during which Ziccardi never mentioned Williams but the "gist" of the conversation was "you tell me what I want to know [and] then maybe you can get your shift" (Id. at 39-40); (4) she had no reason to doubt that Gaw and Ziccardi truly believed that she (Vargas) had accepted referral fees and was not being truthful in her denials of such conduct (Id. at 43-44); and (5) Gaw never asked her to testify falsely against Williams. (Id. at 65-66);

(d) According to Gillard: (1) After Gaw showed her the Excel receipts which he believed she had signed, he said to her "I know you…know what's going on, tell me about Carline and you can keep your job" (Gillard Dep., pp. 14-15); (2) prior

8

to her interview with Gaw, Ziccardi said to her "I need someone to step up to the plate and say they saw Carline take money from Excel" (Id. at 25-26); (3) on another occasion, Ziccardi said to her "give me what I want…say you saw Carline take money" (Id. at pp. 28); (4) on another occasion, Diane Cintron, Employee Relations Manager, said to her that she needed Gillard "to step up to the plate and say [that she] saw Carline take money" (Id. at p. 29); and, (5) she had no reason to believe that Gaw, Ziccardi or Cintron did not sincerely believe that she (Gillard) had accepted improper referral fees.  (Gillard Dep., p. 139-140).

24.

On September 10, 2003, the Arbitrator selected to decide Williams' grievance rendered a decision upholding Williams' termination.  In doing so, the Arbitrator stated:

> The evidence of Grievant's misconduct is clear and convincing.  Security manager Miller's review of phone logs and time cards demonstrates the extraordinarily high number of calls Grievant made to competitors during the two-week period starting June 30, 2000.  She made about 140 calls, an average of 14 per shift.  That is well above the maximum that might have been expected (1 or 2 per shift).  The only reasonable inference that can be drawn is that Grievant was referring customers in order to receive money from the Company's competitors.  That conclusion was confirmed by the deposition testimony of the president of Excel, who identified Grievant as someone he paid for referrals.  It is further confirmed by the Excel cash receipts. (Ziccardi Decl., ¶ 22, Exh. 7).

25.

Prior to February 2002, Swift had requested leave under the Family and Medical Leave Act ("FMLA") at least six times.  (Swift Dep., p 46).  She was not retaliated against for any of these leave requests.  (Id.)

26.

On the same day that Swift was interviewed, she submitted paperwork to Diane Cintron requesting leave under the Family and Medical Leave Act.  (Swift Dep., pp. 49-50, 53). Immediately following the submission of her paperwork, Union President Gerry Pape and Union Steward Gladys Page notified her that she needed to be interviewed tegarding Hertz' investigation. (Swift Dep., pp. 50, 53).

9

27.

The interview was never notified during the interview that Swift had requested leave to care for her husband. (Swift Dep., p. 78). Gaw was not aware of Swift's request for FMLA leave until after Swift's termination. (Gaw Decl., ¶ 28).

28.

Pursuant to the terms of the CBA between Hertz and the Union, the settlement of these grievances by the Union was final and binding. (Gaw Decl., ¶ 23). At no time subsequent to said settlement did any of the affected employees claim that the Union had breached its duty of fair representation by entering into the settlement.

Respectfully submitted this 6th day of December, 2004.

s/John W. Campbell, Esq.
Florida Bar No. 198021

And

Frank B. Shuster
Georgia Bar No. 644722

**CONSTANGY, BROOKS & SMITH, LLC**
100 N. Tampa Street, Suite 3350
Tampa, Florida 33602
Telephone: (813) 223-7166
Facsimile: (813) 223-2515

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of December, 2004, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

William O. Solms, Jr.
Solms & Associates, LLC
One Datron Center, Suite 1602

10

9100 South Dadeland Boulevard
Miami, FL 33156

s/John W. Campbell, Esq.

**CONSTANGY, BROOKS & SMITH, LLC**
100 N. Tampa Street, Suite 3350
Tampa, Florida 33602
Telephone: (813) 223-7166
Facsimile: (813) 223-2515